IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

DEBRA N. ARNOLD,                              CV 09-540-MA

       Plaintiff,                          OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

KIMBERLEY K. TUCKER
Swanson, Thomas, and Coon
820 S.W. Second Ave., Suite 200
Portland, OR 97204
(503) 228-5222

       Attorney for Plaintiff

DWIGHT C. HOLTON
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1007

1   - OPINION AND ORDER

DAVID J. MORADO
Regional Chief Counsel
MATHEW W. PILE
Special Assistant United States Attorney
701 Fifth Avenue, Suite 221A
Seattle, WA  98104-7075
(206) 615-3760

      Attorneys for Defendant

MARSH, Judge.

    Plaintiff Debra N. Arnold seeks judicial review of the Commissioner's final decision denying her June 9, 2005, application for supplemental security income (SSI) benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f.

    Plaintiff claims she has been disabled since May 1, 2004, because of Hepatitis C, back pain, knee pain, and manic depression.  Her claim was denied both initially and on reconsideration.  On May 12, 2008, Administrative Law Judge (ALJ) Jean Kingrey conducted an evidentiary hearing.[1]  On June 27, 2008, the ALJ issued a Notice of Decision that plaintiff was not disabled and, therefore, was not entitled to SSI benefits.

    On March 17, 2009, the Appeals Council denied plaintiff's request for review.  The ALJ's Notice of Decision thus became the Commissioner's final decision for purposes of judicial review.

---

    [1] Two earlier hearings were convened at which the status of the medical records was discussed but no evidence was taken.

Plaintiff now seeks an Order from this court reversing the Commissioner's final decision and remanding the case for the payment of benefits.  For the following reasons, I **REVERSE** the final decision of the Commissioner and **REMAND** this matter for further proceedings.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  <u>Bowen v. Yuckert</u>, 482 U.S.137, 140 (1987).  <u>See also</u> 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since June 9, 2005.

At Step Two, the ALJ found plaintiff suffers from the following severe impairments:  Polysubstance abuse with inconsistent reports of last use; borderline IQ; degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the right knee; anxiety/panic disorder; and related pseudoseizure activities.  <u>See</u> 20 C.F.R. §416.920(c) (an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found plaintiff's physical and

3  - OPINION AND ORDER

mental impairments, when considered either singly or in combination, do not meet or equal any listed impairment. Plaintiff's physical impairments do not prevent her from performing medium level work, except that she should avoid dangerous work locations, not operate hazardous machinery, and not interact closely with co-workers or the general public. She should also perform only simple, routine tasks.

Plaintiff's mental limitations cause her mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. She does not, however, have any areas of decompensation, _i.e._, decreased ability to engage in normal activities of daily living.

At Step Four, the ALJ found plaintiff is unable to perform her past relevant work.

At Step Five, the ALJ found plaintiff is able to perform jobs that exist in significant numbers in the national economy, hand packager and janitor, which are medium-level, unskilled jobs, and small product assembler, which is light-level, unskilled job.

Based on the above findings relating to plaintiff's physical and mental limitations, the ALJ found plaintiff is not disabled and is not entitled to SSI benefits.

4   - OPINION AND ORDER

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however, is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir.), <u>cert</u>. <u>denied</u>, 121 S. Ct. 628 (2000). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." <u>Lewin v. Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981).

## ISSUES ON REVIEW

The issues are whether the ALJ erred in (1) rejecting an examining psychologist's opinion, (2) rejecting plaintiff's testimony, (3) rejecting lay witness testimony of plaintiff's mother, and (4) as a result of these errors, whether the ALJ presented an inadequate hypothetical to the vocational expert (VE).

## PLAINTIFF'S EVIDENCE

Plaintiff's evidence is drawn from her testimony at the evidentiary hearing and a work history report she completed in support of her SSI application.

On the date of the hearing, plaintiff was 50 years old.  She has a 9th grade education and obtained a GED.

Plaintiff was last employed by a realtor, working as a house-cleaner in private homes.  The job involved "deep-cleaning" (i.e., a thorough cleaning, including moving and cleaning furniture and appliances).  She did that kind of work for approximately 10 years.

Before that, plaintiff had jobs planting trees, packing turkeys, and stocking shelves, checking and bagging groceries, and cleaning the floors and bathrooms in a medium-size grocery store.

Plaintiff left her last job because she began experiencing seizures two to three days a week that involved blackouts, during which she would need to sit or lay down.  When the seizures ended she had headaches that made her so tired she wanted to go to sleep.  She "couldn't work like that."

Pliantiff drives infrequently because of her seizures. She has not been told, however, either by her doctors or the Department of Motor Vehicles, that she should not drive.

Plaintiff suffers pain from a sciatic nerve in her back that radiates through her legs into her feet and lasts for at least 30 minutes.

Plaintiff has had surgery on her right knee.  It locks up frequently and she has to pop it, which is very painful and

7  - OPINION AND ORDER

prevents her from putting any weight on that leg.  She is also unable to kneel down or squat because of the pain in both her back and her knee.

Plaintiff has severe pain in her wrists and ankles that is caused by arthritis for which she takes Ibuprofen.  Her ankles swell up at night and also during the day if she walks too much.

Plaintiff has asthma attacks particularly when she is doing strenuous work resulting in severe shortness of breath despite her use of an inhaler.  Plaintiff used to smoke half a pack of cigarettes or more each day but now smokes only two cigarettes a day since she was prescribed Zantac.

Plaintiff started court-ordered treatment for depression at Deschutes County Mental Health in 2004 and has treated at that agency intermittently since then.  She quit the treatment because she had a dispute with the therapist.  She returned to seek treatment in 2006 and has been receiving treatment from that agency on a consistent basis since then.

Plaintiff has poor eyesight and relies on "dollar glasses" to read because she does not qualify for prescription glass benefits under the Oregon Health Plan.

Plaintiff last used methamphetamine in 2007, when her father died.  She had not used that drug for two years before that relapse.

Plaintiff now lives with her mother, who does most of the driving although plaintiff maintains her driver's license in case something happens to her mother.  She is no longer able to walk more than two blocks at a time because of her ankles.  She is able to stand for up to 15 minutes at a time.  She is afraid to go anywhere because of the fear that she will have a seizure.  She had such a seizure a month before the hearing during which she blacked out.  The seizures are now occurring more frequently and are more severe causing her difficulty speaking.

On an average day, plaintiff gets up between 7:00-9:30 a.m., makes her mother coffee, and brings wood in from the outside shed to feed the wood stove, during which she carries three or four logs at a time.  That effort causes her fatigue.  She also washes the dishes, folds laundry, and does basic "very light" housekeeping, including vacuuming.

Plaintiff no longer has friends and does not want to associate with the type of friends with whom she associated in the past.  Her mother is her best friend.  They stay close to home.  They play bingo together if they have enough money after paying the bills.  Plaintiff does not read much because she is unable to remember what she has just read.  She is capable of performing simple math tasks.

## **LAY WITNESS TESTIMONY**

Plaintiff's mother, Dorothy Shockley, testified that plaintiff has lived in her home permanently for two years and off and on before then.  Plaintiff now lives with her because she is unable to care for herself since she started having seizures. The seizures have become "very severe" in the past two years, occurring at least every day, and sometimes two or three times a day.  On occasion, when she has a seizure, she will fall to the floor and flop around like a fish out of water.  Other times, while she watches television, she acts as though she has zoned out.  She is unable to talk during a seizure.  After the seizure ends, she is tired and goes to sleep.  The seizures generally occur when plaintiff is anxious or doing physical things such as helping with housework.

Although plaintiff tries to help with housework, the sciatic nerve in her back and knee pain from prior knee surgery years ago bother her "real bad."  She does help bring in wood, do the dishes, dust, vacuum, and clean the bathroom.

Plaintiff's leisure activities involve playing bingo and watching television with her mother.  She naps every day, sometimes for 2-3 hours, and other times for 15-20 minutes.

Plaintiff's mother does the driving.  Although plaintiff goes to the grocery store with her mother, she usually stays in the car while her mother shops.

10 - OPINION AND ORDER

Plaintiff's mother is aware of plaintiff's history of drug use.  Plaintiff behaved like Jekyll and Hyde while she was on drugs.  Her eyes, hair, overall appearance, and attitude were different.  She "wasn't raised that way."  As far as her mother knows, the last time plaintiff used drugs was in October 2006, when she relapsed after her father died.

Plaintiff has become "very depressed" in the past two or three years because she cannot work, has no money, and relies on her mother to take care of her needs.  She would work if she was able to do so.  Plaintiff's mother does not know why plaintiff left the jobs she had before she began having seizures.

During some of the years plaintiff did not work, she was a stay-at-home mother.  Her two husbands were abusive and violent, which were factors in plaintiff's inability to work.

## MEDICAL/MENTAL HEALTH TREATMENT[2]

### Hepatitis C.

In July 2000, plaintiff was treated at Cascade Family Practice in Bend for fatigue and possible jaundice following a recent diagnosis of acute Hepatitis C.  She complained of right upper quadrant tenderness.  Eighteen months later, she continued

---

[2] Plaintiff's medical records comprise more than 450 pages, dating from August 2004 until January 2008.  The court has reviewed the entire record, but summarizes only those parts of the record that have some bearing on the specific impairments on which plaintiff relies as a basis for her disability claim.

to complain of fatigue.

**Neck and Back Pain.**

In June 2001, plaintiff was treated for a cervical strain
that began at work when she twisted her neck and upper torso
while attempting to catch an item that was falling from a shelf.
On examination, her range of motion was 50% with pain mostly on
the left side of the back of her neck and upper back.  She was
immediately released to work a regular eight-hour day.

In December 2001, plaintiff continued to have upper back
and shoulder discomfort on the left side.  Her treating physician
opined plaintiff was able to perform light duty work.

In January 2002, plaintiff reported she was able to work
five hours a day in a light duty volunteer library job.

In December 2004, plaintiff had mild stiffness when she got
up from her chair.  She had approximately 50% extension and
flexion, 70% lateral bending, and 90% rotation, in her low back.

In December 2006, plaintiff complained of back and neck
pain, and a headache after she fell in the shower.  A CT scan of
plaintiff's cervical spine revealed spondylosis at C4-5 through
C6-7, canal stenosis with flattening of the spinal cord
anteriorly at C4-5 and C5-6 and uncovertrebal joint degeneration
on the left side resulting in left osseous foraminal encroachment
(compression of the spine) at C5-6 and C6-7.

At the same time, an MRI of plaintiff's low back was normal

12 - OPINION AND ORDER

at T12-L1, L1-2 and L2-3.  At L3-4, plaintiff had mild disc degeneration without canal, lateral recess, or foraminal stenosis.  At L4-5, plaintiff had facet arthropathy mostly on the left side of her back, and mild canal and moderate lateral recess encroachment without significant foraminal stenosis.

In December 2007, a lumbar spine MRI revealed a mild diffuse bulge at L1-2, a minor bulge at L2-3, a diffuse bulge at L3-4, a diffuse bulge with ligamentous and facet hypertrophy and mild spinal stenosis at L4-5, and bilateral facet arthropathy at L5-S1.  The diagnosis was degenenerative lumbar spondylosis with bulging discs throughout the lumbar spine.  There was no evidence, however, of disc herniation or high-grade spinal stenosis.  At L5-S1, plaintiff had bilateral moderate to advanced facet arthropathy mostly on the right side, with a central protrusion resulting in mild effacement of the sac.  There was no sign of nerve root compression.

**<u>Knee Pain</u>**.

In January 2003, plaintiff complained of right knee pain that lasted for three days.  The knee was swollen and tender to palpation.  Plaintiff's pain complaint, however, was out of proportion to the physical exam.

In June 2003, plaintiff continued to complain of right knee pain.  She had undergone an operation years earlier but she explained to her doctor that she "never got over her symptoms."

A December 2004 examination did not show any neurological weakness in plaintiff's legs.

In February 2005, plaintiff complained of soreness and locking of her right knee.  She again stated she had been sore since her knee operation years earlier.  The doctor noted the exam was "very hard" because plaintiff was "very guarded, protected and sore everywhere."  Objective findings were within normal limits, and with no instability, or "flexion rotation drawer, pivot shift and jerk."  Plaintiff was diagnosed with "chondromalacia patella, perhaps mechanical knee symptoms due to lateral meniscus."  An x-ray showed early osteoarthritis in the knee.

In March 2007, another x-ray showed an otherwise normal knee except for a mild decreased joint space medially with small osteophytes.  The diagnosis was "mild-to-moderate medial compartment degenerative disc disease."

In May 2007, plaintiff continued to complain of knee pain.

**Seizures.**

In August 2004, plaintiff complained of experiencing seizures 2-4 times a week.  An EEG revealed mild instability at the left mid to anterior temporal region in the right frontal region.  A brain MRI showed no abnormalities.

In October 2004, plaintiff continued to complain of seizures

during which her hands shook.   One of the spells was witnessed
by staff in the waiting room and "it was clearly volitional
shaking in the hands without loss of contact/consciousness."   A
change of antidepressant medication was recommended.

In February 2005, plaintiff no longer complained that her
hands shook, but did complain of "shuddering in the shoulders and
head."   It was suspected plaintiff had a generalized anxiety
disorder and might need "additional input from psychiatry" and/or
adjustment of her anti-depressant medication.

In July 2005, plaintiff complained of seizures 2-3 times a
day, lasting 6-7 minutes.   At the doctor's office, plaintiff had
a body shaking episode that lasted for 5 minutes during which she
was able to walk, speak, and answer questions appropriately
without any difficulty.

In August 2005, plaintiff complained of shaking spells into
her extremities occurring up to four times a day.   The same
month, plaintiff was told she could return to work as a part-time
housekeeper with no limitations.

In September 2005, an EEG revealed no abnormalities.   Her
behavior pattern was consistent with "nonconvulsive" spells or
"pseudoseizures."

In February 2006, an EEG was normal with no seizure activity
identified.

In February 2007, plaintiff underwent a 23-hour video EEG

monitoring procedure "in a variety of situations" which revealed two non-convulsive episodes with no epileptic activity or other instabilities.  No seizures were identified.

In May 2007, plaintiff stated that medication was helping her control her seizures.

In September 2007, plaintiff went to the Emergency Room complaining of a "seizure-like" episode of the type she had been having every day for two years, but this one was particularly severe.  She stated she had fallen off her chair while playing bingo with her mother.  She had a bump on the back of her head, but her examination was otherwise normal.  The examining physician noted plaintiff was scheduled for a mental health examination to determine whether this type of episode was a pseudoseizure (a physical manifestation of an emotional disorder that resembles an epileptic seizure).  The treating physician explained to plaintiff and her mother that there was no evidence of acute disease requiring hospitalization.

**Depression**.

In April 2004, during a mental health crisis screening and evaluation at Deschutes County Mental Health, plaintiff was upset and described herself as a "nobody" and an "outcast" without any support from her family.  She was depressed with suicidal thoughts, was not sleeping well, and had a poor appetite.

In May 2004, plaintiff was taken to the Emergency Room by
police officers after threatening to harm herself with a knife
following a telephone conversation in which her boyfriend told
her he was ending their relationship.  Plaintiff had "very minor
abrasions" to her wrists and stated she was "somewhat depressed."
She has used methamphetamine four days earlier.  The examining
physician, however, did not find plaintiff had a sense of
worthlessness or hopelessness, or any break with reality.  He
opined that plaintiff's risk of harming herself or others was
low.

In March 2007, plaintiff complained she was "falling apart"
and was "extremely fatigued."  She was stressed, depressed, not
sleeping well, and had occasional hot flashes with abdominal
discomfort.  She stated she suffered blackout episodes everyday.
On examination, however, plaintiff's judgment, orientation, mood
and memory were intact, although she appeared anxious and had a
scattered thought pattern.  She was diagnosed with depression,
generalized anxiety disorder, insomnia, and a memory disturbance.

In May 2007, plaintiff complained of extreme fatigue and
restless leg syndrome.  She also stated, however, that her

17 - OPINION AND ORDER

medication had greatly improved her depression and anxiety, although she continued to have panic attacks.

In October 2007, plaintiff again complained of being anxious most of the time, feeling depressed and emotional.  She was diagnosed, <u>inter alia</u>, with depression, general anxiety disorder w/panic disorder, syncopal episodes (fainting) with "likely anxiety-induced vs. recurrent seizure," and fatigue.

### MENTAL HEALTH EVALUATION

In December 2007, psychologist William Trueblood, Ph.D., examined plaintiff and reviewed her medical records on behalf of Disability Determination Services.  Plaintiff was cooperative and pleasant.  Her activity level was average, her pain behavior was mild, and her statements were relevant, coherent, logical and goal-directed, with no evidence of hallucinations or delusions. Her affect was appropriate without anxiety or irritability, although she cried briefly and was subdued.

Dr. Trueblood made the following provisional diagnoses: Conversion Disorder; Major Depression-mild and recurrent; Panic Disorder with mild Agoraphobia; Methamphetamine Abuse in full remission; Cannabis Abuse in full sustained remission; Rule Out cognitive disorder NOS; Attention Deficit Hyperactivity Disorder; Borderline Intellectual Functioning; and Rule Out antisocial and borderline personality characteristics.

18 - OPINION AND ORDER

Dr. Trueblood assigned a current GAF score of 50 (serious symptoms - suicidal ideation, serious impairment in social, occupational, or school functioning).  Dr. Trueblood, however, also observed that:

> If the rating were based on apparent
> capabilities such as the patient's capability
> relating to cooking, driving, and money
> management, the impairment rating would be
> only mild.  The discrepancy between her
> apparent capability and her actual
> functioning appears to be due to the
> Conversion Disorder (and likely secondary
> gain) as well as depression.

Dr. Trueblood opined that plaintiff did not malinger during the evaluation, although he was "far from certain of this." Based on his evaluation, Dr. Trueblood concluded plaintiff's pseudoseizures would have some impact on her memory but not to a marked degree.  Accordingly, Dr. Trueblood opined plaintiff would have slight impairments in understanding and remembering short, simple instructions and making judgments on simple work-related decisions, and moderate impairments in understanding and carrying out detailed instructions.  Plaintiff would also have moderate impairments in interacting appropriately with co-workers, and responding appropriately to work-place pressures and changes in routine in the usual work-place setting.  He also found plaintiff was markedly impaired in her ability to sustain attention, concentration, and persistence.

19 - OPINION AND ORDER

**ANALYSIS**

a.   **Rejection of Examining Psychologist's Opinion**.

Plaintiff asserts the ALJ improperly rejected examining psychologist Dr. Trueblood's evaluation and opinion of the severity of plaintiff's mental health limitations, particularly relating to Dr. Trueblood's provisional diagnoses of major depression (mild-recurrent), and conversion disorder, with a resulting marked limitation in plaintiff's ability to sustain attention, concentration, and persistence in a work place setting.   I disagree.

To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.  Id.  Also, when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings. Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ thoroughly addressed Dr. Trueblood's findings following his psychodiagnostic examination of plaintiff.  As to plaintiff's diagnosis of "conversion disorder," the ALJ noted Dr.

20 - OPINION AND ORDER

Trueblood's concern over the possibility that plaintiff
malingered during the course of his examination of her and that
if his disability rating was based on plaintiff's "apparent
capabilities related to cooking, driving, and money management,"
his impairment rating would only be mild.  The ALJ also included
in her hypothetical to the VE, Dr. Trueblood's opinion of the
effect of plaintiff's mental limitations on her limited ability
to maintain concentration, and her need to avoid close
interaction with the general public and co-workers.

      On this record, I conclude the ALJ adequately considered
Dr. Trueblood's assessment of plaintiff's mental capabilities in
determining her ability to engage in substantial gainful
activity.

**b.**    **Rejection of Plaintiff's Testimony**.

      A claimant who alleges disability based on subjective
symptoms "must produce objective medical evidence of an
underlying impairment 'which could reasonably be expected to
produce the pain or other symptoms alleged. . . .'"  Bunnell v.
Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C.
§ 423(d)(5)(A) (1988)).  See also Cotton v. Bowen, 799 F.2d 1403,
1407-08 (9th Cir. 1986).  The claimant need not produce objective
medical evidence of the symptoms or their severity.  Smolen v.
Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

      If the claimant produces objective evidence that underlying

impairments could cause the pain complained of and there is no affirmative evidence to suggest the claimant is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). See also Smolen, 80 F.3d at 1283. To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. Id. at 1284 (citations omitted).

If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). I find there is no basis in the record to second-guess the ALJ's reasons for not crediting plaintiff's testimony regarding the severity of her physical impairments.

The ALJ found plaintiff's subjective complaints and description of her alleged physical impairments were not credible, in part because she did not tell an emergency room doctor from whom she sought pain medication that she had been to

the same emergency room two days earlier for the same purpose.
In addition, when it became clear she would not be prescribed
pain medication plaintiff left the emergency room, threatening an
"investigation" of the medical staff, even though she told the
doctor she was in so much pain she could not walk.  The ALJ also
noted plaintiff sought pain medication for her back pain from
multiple providers, despite the lack of objective medical
evidence to support a finding other than mild degenerative
disease in her lumbar spine and knee.  Finally, the ALJ pointed
out discrepancies in plaintiff's reporting of the frequency and
severity of her pseudoseizures.

On this record, the court concludes the ALJ gave clear and
convincing reasons for not fully crediting plaintiff's testimony
regarding the severity of her impairments.

c.  **Rejection of Lay Witness Evidence**.

Lay witness evidence as to a claimant's symptoms "is
competent evidence that an ALJ must take into account" unless he
"expressly determines to disregard such testimony and gives
reasons germane to each witness for doing so."  Lewis v. Apfel,
236 F.3d 503, 511 (9th Cir. 2001).

Plaintiff contends the ALJ did not give germane reasons for
rejecting much of her mother's evidence regarding her physical
and mental  disabilities.  I disagree.

The ALJ rejected a July 2005 statement by plaintiff's mother

23 - OPINION AND ORDER

that plaintiff was unable to work because plaintiff's physician
released her to work with no limitations a month later.  Although
plaintiff asserts she had been working only part-time before
then, she was released to work full-time by her doctor.

The ALJ rejected the mother's evidence that plaintiff was
unable to talk when she was having seizures, because there was
substantial evidence that plaintiff was observed talking while
she was having pseudoseizures.

The ALJ also rejected the mother's evidence that plaintiff
used a walker intermittently because of back pain because there
was no evidence that plaintiff was ever prescribed a walker.
Although plaintiff asserts she used her mother's walker and,
therefore, did not need a prescription, there is nothing in the
medical record to indicate plaintiff needed a walker based on the
mild nature of her back and knee impairments.

Finally, the ALJ rejected the mother's opinion that her
doctors appeared not to be interested in plaintiff's seizure
condition.  To the contrary, the ALJ referred to the extensive
medical studies and tests that were performed on plaintiff to
find a physical cause for the seizures, which ultimately led to
the finding that plaintiff experienced pseudoseizures.

On this record, the court concludes the ALJ gave germane
reasons for rejecting evidence presented by plaintiff's mother in
support of plaintiff's disability claim.

**d.    Inadequate Hypothetical to Vocational Expert (VE).**

In her hypothetical to the VE, the ALJ asserted that plaintiff "was limited to simple and routine tasks."  The ALJ did not include Dr. Trueblood's opinion that plaintiff specifically was <u>markedly</u> limited in her ability to maintain concentration, persistence, or pace.  Plaintiff asserts the limitation described in the ALJ's hypothetical to the VE, therefore, was inadequate. The court agrees.

In <u>Berjettej v. Astrue</u>, 09-CV-892-BR, 2010 WL 3056799 *7 (July 30, 2010), the court reaffirmed that in social security cases in this District and in the Ninth Circuit generally, psychological findings of examining or consulting medical practitioners "relating to concentration, persistence, or pace must be included in the hypothetical posed to the VE in some manner, and that a hypothetical that includes a limitation to simple work does not [adequately] address deficiencies in concentration, persistence, or pace."

Accordingly, the court concludes the ALJ erred in failing to incorporate Dr. Trueblood's specific finding as to plaintiff's marked difficulty in maintaining concentration, persistence, and pace, in his hypothetical to the VE.  The Commissioner's final decision, therefore, must be remanded.

25 - OPINION AND ORDER

## SCOPE OF REMAND

Based on the record, in the exercise of my discretion, I conclude that a remand for the immediate payment of benefits, as requested by plaintiff, is not appropriate.  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  On remand, the ALJ shall present to the VE a hypothetical that specifically addresses plaintiff's marked limitations in maintaining concentration, persistence, and pace.

## CONCLUSION

For these reasons, the court **REVERSES** the decision of the Commissioner and **REMANDS** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this 31  day of   August        , 2010.


   /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge


26 - OPINION AND ORDER